**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------------------- X

HOWARD RUBINSKY,

                           Plaintiff,                              Case No.: 2:14-cv-01540

          -against-

AHMED ZAYAT, a/k/a
EPHRAIM ZAYAT,

                          Defendant.

------------------------------------------------------------------- X

## PLAINTIFF'S CORRECTED MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS...............................................................i

TABLE OF AUTHORITIES...........................................................ii

PRELIMINARY STATEMENT........................................................1

ARGUMENT............................................................................1

Statement of Additional Facts Showing the Existence of Material
 Issues of Fact Precluding the Granting of Summary Judgment...........................3

1. Questions of Fact Regarding the Relationship between the Parties........................3

2. Questions of Fact Regarding the Existence of An "Agreement" by
Zayat to Pay Rubinsky $1.65 Million to Reimburse Rubinsky for
Covering Zayat's Lawful Gambling Obligation to Tradewinds...............................4

Zayat's April 6, 2008 Written Promise To Pay............................................9

I.      THE TEXT EXCHANGE ON APRIL 6, 2008 CONSTITUTES A "WRITING"
        WITHIN THE MEANING OF N.J. Stat. Ann., 18 U.S.C. § 2A (2012)............13

II.     This Action Was Timely Commenced.............................................15

III.    Zayat Received A Benefit At Rubinsky's Expense...................................15

IV.     Zayat's Promise To Reimburse Rubinsky for Money That Rubinsky Earned
        Lawfully in Costa and That Tradewinds Set-Off Against Zayat's Obligation
        To It For His Lawful Gambling Is Enforceable in New Jersey.......................17

Conclusion............................................................................20

# TABLE OF AUTHORITIES

## United States Code

18 U.S.C. § 1084 (2012)..................................................................................................... 17

## New Jersey Statutes

N.J. Stat. Ann. § 2A 14-24....................................................................................2, 12, 13

N.J. Stat. Ann. § 2A:14-1....................................................................................................15

## United States District Court

Viking Communs., Inc. v AT&T Corp., 2006 U.S.Dist. LEXIS 27420 (D.N.J.2006)...........................13

## New Jersey State Opinions

Caribe Hilton Hotel v. Toland, 63 N.J. 301, 307 A.2d 85 (1973)..........................................19

Paradise Enters. v. Sapir, 356 N.J. Super. 96, 811 A.2d 516 (Super. Ct. 2002)...........................19

Nat'l Recovery Sys. v. Feltman, 211 N.J. Super. 526, 511 A.2d 1307 (Super. Ct. 1986).............................19

Evers v. Jacobsen, 129 N.J.L. 89,91 (1942).........................................................................14

## New York State Opinions

Naldi v. Grunberg, 80 A.D.3d 1 (1st Dep't 2010).................................................................15

## Rules

Fed. R. Evid. 404(b)(1) ...................................................................................................... 2

Fed. R. Evid. 801(d)(2) ...................................................................................................... 6

## Other

General Obligations Law § 5-703.........................................................................................14

## Preliminary Statement

Plaintiff Howard Rubinsky ("Rubinsky") respectfully submits this

Memorandum of Law in opposition to the motion of Defendant Ahmed Zayat,

a/k/a Ephraim Zayat ("Zayat") for summary judgment.  To put things into context,

Zayat is to be congratulated for having invested in "American Pharoah," the horse

that just won the Kentucky Derby.  All of the people involved with this case,

Zayat, Rubinsky and non-parties, the Jelinsky Brothers, have all been involved one

way or the other with thorough-bred horse racing for many years.  Zayat, however,

is the only person with millions of dollars riding on the ability of Zayat Stables to

remain licensed by various state licensing authorities and it is therefore astounding

that with absolutely no evidence to support the allegation, Zayat's attorneys accuse

him of unlawful internet gambling thereby casting doubt on Zayat Stables ability to

repeat its Kentucky Derby win or perhaps even to survive until the end of the

Triple Crown.  In an odd twist of fate, it is Rubinsky's critical analysis of both the

facts and the law that should save the bright future of Zayat Stables.

## Argument

Zayat's motion papers are fairly subject to criticism for five principal

reasons.  First, they are confusing because they include many, many irrelevant

assertions of fact.  For example, why is mention made by Zayat of Rubinsky's

convictions of prior crimes related to gambling when evidence of such convictions is inadmissible at trial pursuant to Fed. R. Evid. 404(b)(1)?

Second, why does Zayat simply assume – utterly without discussion – that New Jersey, historically a progressive state, will reject the law of every other state when it first considers whether an e-mail constitutes a "writing" within the meaning of N.J. Stat. Ann. § 2A 14-24?

Third, why does Zayat ignore the fact that this action was commenced within six years after the date on which Zayat promised in writing to reimburse Rubinsky for the monies that Tradewinds took from him to satisfy Zayat's debt to it on a weekly basis?

Fourth, how can Zayat reasonably contend that Rubinsky's satisfaction of a lawful gambling debt he owed under Costa Rican law to Tradewinds did not confer a benefit on him?

Finally, why do Zayat's lawyers fail to address, much less attempt to rebut the mountain of facts supporting Rubinsky's reasonable basis to assume the truth of the Jelinskys' representations that he was being asked to facilitate **lawful** internet gambling by Zayat with bets being placed by Zayat while he was at work in Cairo?  Zayat confirmed at his deposition Rubinsky's initial and consistent understanding that Zayat had very limited time in the United States, most of which was consumed by his observance with his family of Shabbat.

Given his wealth and position in the business world, why would Zayat gamble illegally during a theoretically miniscule "window of opportunity" while in the United States, when he could legally gamble the rest of the week?  It simply makes no sense for Zayat to have violated U.S. law and, more importantly, there is not a single piece of evidence to rebut Rubinsky's very reasonable belief that he did not do so.

### Statement of Additional Facts Showing the Existence of Material Issues of Fact Precluding the Granting of Summary Judgment

### 1.   Questions of Fact Regarding the Relationship Between the Parties

At his deposition, Zayat described his relationship with Rubinsky as follows:

> Let me make it very easy for you.  The **only time** I ever spoken or heard about Howie is the day that he came to my house unannounced, and the time before meeting me in my office by calling me or texting me or try to arrange to meet me, and I think that was in 2008 or something like that.  That's the only time that I have ever had any contact either seeing him or talking to him or dealing with him period.  It was a nonevent in my life until he called me to come and meet me and arrange a meeting with me in my office.  I have met him twice in my life or three times.  I can't even recall that.

ZTr. 57:21-58:11[1].

Zayat testified that his cell phone number has been 201-803-0957 for many years.  ZTr. 5:1-11.

---

[1]  The complete transcripts of the depositions of Rubinsky, Zayat and the transcription of text messages between the two that Rubinsky preserved on two of his cell phones are attached to the accompanying declaration of J. Joseph Bainton as Exhibits A, B and C, respectively.  References to those transcripts are in the form of" ZTr" For the Zayat transcript; "RTr" for the Rubinsky transcript; and "TTR" for the Text transcript.

Plaintiff has maintained two cell phones on which text messages "to" and "from" that cell phone number have been preserved.  Counsel for both parties caused messages "to" and "from" those two phones to be transcribed as stated in Defendant's moving papers.  A copy of that transcript in non-condensed font is attached to the Bainton declaration as Exhibit C.  A condensed version of the same transcript, which is difficult to read due to the size of its font is attached to the moving declaration of Stephen Wagner as Exhibit M.

Plaintiff respectfully submits that the transcripts of those texts cannot reasonably be reconciled to the testimony of Defendant quoted above and thus a material question of fact exists as the nature of their relationship.  The fact that Defendant actually paid Plaintiff $50,000, of which Plaintiff has a canceled check for $25,000 (Exhibit D to the Bainton Declaration) is flatly inconsistent with Defendant's testimony quoted above and consistent with the written promises of Zayat that appear in the texts messages in Exhibit C to the Bainton declaration.

### 2. Questions of Fact Regarding the Existence of An "Agreement" by Zayat to Pay Rubinsky $1.65 Million to Reimburse Rubinsky for Covering Zayat's Lawful Gambling Obligation to Tradewinds

The text messages in the "Outbox" of Rubinsky's cell phone do not bear a date and time stamp as do the messages in the "Inbox."  However, by comparing the language of the messages appearing in the Outbox to the time and date stamped

messages appearing in the Inbox reasonable inferences can be drawn by the jury as to the relationship between the two.

First, at trial Rubinsky will argue that the message in the Outbox beginning at page 19, line 13 will corroborate his oral testimony that Zayat told him that among the many ways that the Jelinsky Brothers cheated Zayat out of millions of dollars was by convincing Zayat to pay to them the balance of the money that Zayat acknowledged that he owed to Tradewinds Casino  and Zayat later learned from Rubinsky that Zayat actually owed to Rubinsky because (a) the Rubinsky Brothers had not – as they had told Zayat – paid Zayat's debt to Tradewinds and (b) Tradewinds had deducted Zayat's debt to Tradewinds from monies that Tradewinds otherwise would have paid to Rubinsky.

The text states:

I just wanted to tell you that I was stunned when I met you, I want you to understand something, I am not anything like those guys [referring to the Jelinskys], they are evil bad kids. I am not in their category. They owed 2 mill. I have not spoken to Micheal in 3 years. The other mut I have been fighting with for three years. I was dealing with him only trying to get my money back. **I had no idea that you gave them the money you owed me.** Do you honestly believe I would sky you for anything if I knew you gave it to them. These guys have ruined my life, they are liars, thiefs and drug addicts. They have [sic] regard for anybody. Jeff I told I would see you, I said to him I would tell you, he said don't tell him we speak. I asked why and he said that he told you he hasn't spoke to me.

I did not know his alterior motive. I am telling you the truth. **I told him I would ask for that you owed not knowing you already paid them. I was upset with you and mad at you in the beginning but I did not know your gave them for me. They set me up.** I know I am being honest regardless what those people told you. **I would take a polygraph just for you.**

When you were sick I really did prey for you. I do care about you and I do want you to be heltiy and love you in a special way Fry. I don't want to defend myself, I let these guys make a monkey out of me.

ZTr. 19:13-20:17. Zayat's failure to ever dispute that he mistakenly paid the

Jelinskys the money he owed Tradewinds can be viewed as an adoptive admission

pursuant to Fed. R. Evid. 801(d)(2).

After an off the record discussion, Zayat's counsel, Mr. Wagner, made the

following statement with the concurrence of Rubinsky's counsel:

MR. WAGNER: There is no obvious way to tell what date and time this message was sent on the phone. My assistant is going to see if she could figure out by looking at a website that explains how to do these things. But so right now the only thing we know about this is this is the first message that Mr. Rubinsky sent to Mr. Zayat that's on this phone at least in this sequence, but we don't have a date or at time.

TTr. 20:20-21-4.

At his deposition, while still denying ever having heard of Tradewinds, much less gambling there and, as quoted above, swearing that he barely knew Rubinsky, Zayat did concede under oath the he believed that he had been scammed by the Jelinskys:

QUESTION:      As you sit here today, do you believe that you were scammed by the Jelinsky brothers?

ANSWER: Oh, yes.

QUESTION: Could you explain to me why you believe that?

ANSWER: The government came on and said, "Okay, you sound suspicious of us. We want you to believe us. There is no reason for us to come here. We let you hear things. I said, "Hear things?" They said, "Yes."

QUESTION: Can you tell me what they let you hear? I just want to understand why you believe you were scammed by the Jelinskys. You haven't told me that part yet.

ANSWER: Are we up to that yet? I am trying to answer that question.

QUESTION: I hope we are up to that. My question is what did the government tell you that led you to believe that you had been scammed by the Jelinskys?

ANSWER: Your question was tell, not hear. I'm trying to be Talmudic, meaning I am trying to be accurate. Ask the question, answer as is.

QUESTION: I'll try to ask a better question. What did the government say to you that has led you to the conclusion that you have been scammed by the Jelinskys?

7

ANSWER:  Exactly what I just told you before.  They told me, "You have been the victim of the Jelinskys."  I looked at them.  "What are you talking about?"

QUESTION:  Did they tell you how you were scammed?

ANSWER:  They made me hear it myself how I was scammed.

QUESTION:  What did you hear?

ANSWER:  They put on a tape which was a conversation between the two brothers supposedly trying to scam me.  Remember I told you that there was a summer, I believe either it was 2007 or something of that nature, where that summer where I was not able to bet on my own personal accounts because I was in California, and in California you can't bet online at a California track.  That was the law.  And therefore, I was betting my horses through Michael, and Michael was apparently giving me horses that he personally liked, okay.  And these horses were being put in supposedly in the pools, but they were actually – the two brothers was conspiring and booking these bets.  Meaning let's say that they really like, legitimately they are betting the race themselves, they like one, tow three.  They were on purpose giving me five, six, seven.  They are telling me to bet it.  These bets were never actually put on in the pools.  They are booking these bets so these horses were being not correct.  So I would lose because they are giving me the wrong horses.  But even these were not a – they were not putting the money in the pool that I thought it was.  It never – it wnet into their ownb pocket.  So they developed a scam and they made me hear the conversation between the brothers plotting how they are actually going to do that by one calling me and telling me that he liked that, that, that and then putting these bets.  So they showed me that I was a victim of people who they believed I was good friends for them, that I was socially helping them.  And when I asked them, **"How do you know I was good friends?"  They said because that they have been taping these boys for a year or more.**

ZTr.61:24-65:6.  (Emphasis added.)

When asked when the meeting with the Government at which he learned he had been scammed occurred, Zayat testified that he could not remember even the

year, "but you want me to guess, maybe 2007, 2008.  I can't remember."  ZTr. 50:2-9.

Accordingly, Zayat's sworn testimony does not contradict Rubinsky's text message quoted above that states that prior to "promising" to repay Rubinsky the $1.65 Million that Tradewinds had taken from Rubinsky to cover Zayat's gambling obligation to it, Zayat knew that (a) he thought he had paid that obligation to Tradewinds by giving the money actually owed to Tradewinds to the Jelinsky Brothers and (b) the Jelinsky Brothers had not paid Tradewinds and therefore Tradewinds had satisfied Zayat's debt to it by withholding monies from Rubinsky it otherwise owed him.

**Zayat's April 6, 2008 Written Promise To Pay**

Among all of the undated text messages that Rubinsky sent to Zayat there is one – and only one – that contains the phrase "postdated checks" or for that matter any words that could conceivably be construed to be a reference to the concept of postdated checks.  It states:

Fry, it's **Sunday** morning about **8:30 a.m.**  Congratulations on JBK.  I have been sticking around, I was planning to go to Boston to visit a friend, then to Canada on some business deals.  But I might not be able to go.  I have feeling weak and lethargic.  I had my blood pressure taken and it was very dangerously high.  I have an appointment with a top cardiologist in the city on Monday afternoon.  The stress, weight and pressure are killing me.  Can you please find the time when you are not busy and feeling well to meet my friend Mark and his partner who used to be an ATT .. For Ladbrook to discuss Mexico and other potential BUS.  I don't even have to there is say so.  Also Jose Santos has stong ties with a horse owners and breeders in S. America Brazarg and especially Chille as he was born there.

I was also going to ask you if it is okay if you helqp me with **some of the balance that you promised** cause I don't know where I will be, plus I am just trying to pay all these bills.  Also the doctor on Monday I have to pay up front.  I know you are trying to help by budgeting this, **maybe you can give me postdated checks**, I just hate bothering you with this.  Thanks for everything.  I just want you to know that I am not a one-way street.  I am trying really hard to find good deals.  Thanks for everything.

TTr. 24:11-25:15. (Emphasis added.)

Among the messages from Zayat to Rubinsky, all of which show both the date and time at which they were received, there is one – and only one – message that makes reference to the topic of postdated checks.  It was sent on **Sunday, April 6, 2008 at 9:30 A.M**.  It is therefore fair to infer that it was replying to Rubinsky's  text sent approximately one hour earlier on the same Sunday.  In his text Zayat stated:

10

> Good morning Howie, feel better, take care of yourself …. I will meet your friends, give me their number and I will coordinate directly with them as my constantly changes my trip to celveland was not good, they got me more confused, one fucker hinks I have a rare form of cancer and they are all wrong **I will mail you checks every Friday, just give me an address, I will not postdate check,** why?? No reasons, I am not obliged to pay anything is just helping you out, don't own a soul anythings, God knows how much I helped everone, I am not responiable if your friends are crooks and robbed Y.  Our money, I did my part and YOU KNOw that , , , I am more than generous, I love you and help you as a friend and a good decent Yiddish boy, good luck, so text me your friends contacts and I will call them sometime this week, and **give me address every Thursday to Fed Exp a [c]heck for you and I promised to.**

Tr. 13:20-15:4.  (Emphasis and matter in brackets added.)

Zayat's text uses the word "promise" not once, but twice, to describe his commitment to send Rubinsky a check on a weekly basis via FedEx.  There was nothing conditional about this promise.  Zayat did not say "When I can," or "when I feel like it," or anything else equivocal.  He said "every Friday."  After he sent this text, Zayat did in fact provide Rubinsky two consecutive checks, each in the amount of $25,000.  Rubinsky failed to make a copy of the first check, but did keep a copy of the second check, which at his request was made payable to his sister. *See* Exhibit D to Bainton Declaration.

The second check was drawn on an account of the "Zayat Foundation." During discovery, the Zayat Foundation and Zayat were incapable of producing any records relating to any payment.

11

Zayat will of course argue that that portion of the text that disclaims liability prevents this text from fulfilling the requirements of N.J. Stat. Ann. § 2A 14-24 in the event the Court concludes that New Jersey will in fact follow the majority rule that treats e-mail and text communications as "writings" for statutes of frauds purposes for the reasons discussed below. Rubinsky will argue to the jury that when read in context it is more "sour grapes" about the Jelinsky Brothers and nothing in it backs away from Zayat's earlier oral promise to make Rubinsky whole from the consequences that flowed from Zayat foolishly paying a debt he knew he owed to Tradewinds to the Jelinsky's rather than to Tradewinds as he had originally promised to do to Rubinsky.[2]

Rubinsky contends that the use of the word "promise" combined by Zayat's subsequent honoring of that promise is strong evidence supporting the construction of the text message as a promise within the meaning of N.J. Stat. Ann. § 2A 14-24. Accordingly, Rubinsky respectfully submits that there is a disputed issue of material fact as to the meaning of Zayat's text that precludes the granting of his motion for summary judgment.

---

[2]  Rubinsky testified that he first met Zayat at the Venetian Hotel in Las Vegas and the "entire meeting" was about Zayat's debt to Tradewinds. When asked "What did Mr. Zayat tell you during this meeting?" Rubinsky answered "He said I will pay the debt. I need some time, I will pay the debt." RTr. 29:10-18. Obviously as long as Zayat was paying Tradewinds, Rubinsky had no problem with Tradewinds.

## I.    THE TEXT EXCHANGE ON APRIL 6, 2008 CONSTITUTES A "WRITING" WITHIN THE MEANING OF N.J. Stat. Ann. § 2A 14-24

N.J. Stat. Ann. § 2A 14-24 is New Jersey's codification of the Statute of Frauds.  Most states have adopted similar laws requiring a variety of transactions to be memorialized in a writing.  From the time of the quill pen and parchment paper through somewhat beyond the era of the electric typewriter and the collating photocopier replacing carbon paper, the concept of a "writing" did not merit much attention from our courts.

Then came the internet.  Corporate and major real estate closings no longer uniformly happened in one conference room of one law firm.  Filings with the United States Securities and Exchange Commission not only were not uniformly made in written format, they could not be filed other than electronically.  Court filings – initially in some and later all federal courts – and then state courts moved from paper filings to electronic filings.  Today, with very limited exceptions for *pro se* litigants, it is virtually impossible to file anything with a federal court and many state courts other than electronically.

While no New Jersey court has yet construed whether an electronic transmission such as an e-mail or a text message  meets the "writing" requirement of  N.J. Stat. Ann. § 2A 14-24, in Viking Communs., Inc. v. AT&T Corp., 2006 U.S. Dist. LEXIS 27420 (D.N.J. 2006) , this Court considered

whether the content of an e-mail – not the e-mail itself – was adequate to meet the requirements of a "written notice of claim" thereby implicitly holding that the fact that an e-mail was not manually signed by its author in and of itself did not disqualify if from being a "writing."

In <u>Naldi v. Grunberg</u>, 80 A.D.3d 1, 908 (1st Dep't 2010) N.Y.S. 2d 639 [1st Dept 2010], the Appellate Division of the New York Supreme Court expressly held that an e-mail can satisfy the "writing" requirement of the statute of frauds. ("Defendant … argues, among other things, that the alleged right of first refusal is not enforceable under the applicable stature of frauds (<u>General Obligations law§ 5-703</u>) because it was memorialized in an e-mail only.  We reject this argument, reaffirming our prior decisions that have held (albeit without extensive discussion) that an e-mail will satisfy the statute of frauds so long as its contents and subscription meet all requirements of the governing statute."

Here, under well settled New Jersey law, Zayat's promise must have been "unconditional and unqualified."  <u>Evers v. Jacobsen</u>, 129 N.J.L. 89, 91 (1942). Zayat's promise was exactly that, he promised to send Rubinsky a check every week and then he did so until he breached his promise.

## II.    This Action Was Timely Commenced.

The parties agree that Zayat's claim is governed by N.J. Stat. 2A: 14-1, which provides for a six year period of limitations.  This action was commenced on March 11, 2014 [D.E. 1], which was less than six years after Zayat promised in writing via the above quoted text exchange to make weekly payments to Rubinsky on April 6, 2008.  Accordingly, this action was timely commenced.

## III.   Zayat Received A Benefit At Rubinsky's Expense

Zayat's entire argument in support of his motion to dismiss Rubinsky's claim based upon the doctrine of unjust enrichment is predicated upon the proposition that Rubinsky has "no evidence" of this or that.  That simply is not true.  Rubinsky has his own sworn testimony that the jury can chose to believe or not believe.

This Court's obligation on this motion is not to judge credibility, but rather to determine whether there are material questions of fact worthy of submission to a jury.

As Zayat's counsel correctly observes, Rubinsky and Zayat swear to two, entirely different stories.  One of the two men cannot conceivably be telling the truth.

In determining whether there exist genuine issues of fact, Rubinsky asks the Court to do three things:

First, compare Zayat's description of their relationship quoted at page 4 above and compare it with the messages that **Zayat sent** to Rubinsky and then ask itself if it believes that there is more than an insubstantial chance that a reasonable jury could conclude that Zayat's quoted testimony was not truthful?

Second, Rubinsky asks that the Court re-read Zayat's testimony quoted at pages 7-8 above and consider how a reasonable jury might react were similar, patently evasive  testimony to be presented at trial.

Third, Rubinsky asks the Court to recall the standard jury charge to the effect that if a jury finds a witness's testimony false in some things it can, but it need not necessarily, find that witness' testimony false in all things.

The reason why Zayat asks this Court to ignore "evidence" in the form of Rubinsky's sworn testimony is obvious.  Zayat is terrified of the outcome of a "swearing contest" between Rubinsky and him decided by a jury of their peers.

That said, Rubinsky's sworn declarations now contained in his deposition transcript and later to be offered live at trial are evidence within the meaning of the Federal Rules of Evidence and therefore Zayat's arguments based upon the contention that no evidence exists should therefore be rejected.

IV.   **Zayat's Promise To Reimburse Rubinsky for Money That Rubinsky Earned Lawfully in Costa and That Tradewinds Set-Off Against Zayat's Obligation To It For His Lawful Gambling Is Enforceable in New Jersey**

Rubinsky's testimony is unrebutted.  It was his understanding that during the period when **Zayat was betting** with Tradewinds, he was betting from Cairo, where he was employed.  That **after** the debt was incurred and not paid Zayat moved to New Jersey on a full time basis is wholly irrelevant.

Internet gambling between Egypt and Costa Rica at all relevant times was lawful.  Facilitating lawful gambling by United States citizens in foreign venues is an activity that is also lawful.  Travel agents do it on a daily basis.

The person who engaged in betting or wagering was Zayat and not Rubinsky.  There were a host of reasons why it was reasonable for Rubinsky to have believed that Zayat would not have violated 18 U.S.C. § 1084.  It was widely reported in the press that in 2002, the year before Rubinsky accommodated Zayat at the Jelinskys' request, Zayat had sold his company Al Ahram Beverages Co., which he founded in 1997, to Heineken for $280 Million, some 4 times what he paid for it and Heineken had given him a contract worth $50 Million to stay on as CEO in Cairo.   Why would Zayat jeopardize all of that to gamble during part of the only day in the week when he was in the United States and theoretically available to do so.  In this regard, one needs to bear in mind that Zayat is an observant Jew, which was one of the

reasons why he flew half way around the world every weekend to be with his family, but also a reason that limited his time to gamble during the brief time he was in the United States with his family.

Moreover, given Zayat's regular schedule, whatever time he theoretically might have had to gamble was miniscule in light of the following:

QUESTION:  I want to know what do you mean by the weekend?

ANSWER:  My life was a plane.

QUESTION:  You have said that.  Explain what you mean by that.  When you say went for the weekend, the days of the week, can you explain it to me?

ANSWER:  I would leave Cairo on Thursday evening, arrive in the States around 6:00 a.m. in the morning Friday.  I would spend Friday until Saturday night called Shabbat.  I would leave Egypt around 11 o'clock.

QUESTION:  Leave New York.

ANSWER:  Sorry, New York, 11 o'clock Saturday night.  I would arrive Egypt next day Sunday.

ZTr. 24:16-25:9.  This theoretical "window of opportunity" could not create a $2 Million gambling debt.

Accordingly, Rubinsky's testimony that he facilitated lawful online gambling by Zayat between Egypt and Costa Rica is unrebutted and worthy of belief by a jury.

Since Zayat's  gambling debt was lawful where created in Costa Rica and could be collected there, it is enforceable in New Jersey.  <u>Caribe Hilton Hotel v.</u>

<u>Toland</u>, 63 N.J. 301, 307 A.2d 85 (1973); <u>Paradise Enters. v. Sapir</u>, 356 N.J. Super.

96, 811 A.2d 516 (Super. Ct. 2002); <u>Nat'l Recovery Sys. v. Feltman</u>, 211 N.J.

Super. 526, 511 A.2d 1307 (Super. Ct. 1986).

## Conclusion

For the foregoing reasons, Zayat's motion should be denied.  Rubinsky has

opposed Zayat's motion by (1) providing the Court with evidence of Zayat's

written promise to pay him weekly the money that Zayat foolishly paid the

Rubinsky Brothers rather than Tradewinds to satisfy his debt to Tradewinds for

which Rubinsky was later held accountable in the form of the April 6 text

messages exchange; (2) provided written evidence of Zayat's payment of an

installment in performance of that written promise; (3) shown that this action was

in fact commenced within six years of not only of the date of the breach of the

contract, but, moreover, within six years of the date of the contract itself; (4)

pointed out that his sworn testimony constitutes "evidence" within the meaning of

the Federal Rules of Evidence and the suggestion that it simply be disregarded has

no basis whatsoever in the law, but instead reflects Zayat's terror at the prospect of

a jury determining the credibility of both parties in the face of the obvious fact that

one of them has to be a blatant liar; and (5) shown that because there is no

evidence to dispute the proposition that Zayat engaged in lawful online gambling

19

between Egypt and Costa Rica that lawful gambling resulted in a gambling debt

that is enforceable in New Jersey.

Dated:  New York, New York
        May 6, 2015

                    BAINTONLYNCH LLP

                    By: _____
                            J. Joseph Bainton (JB-5934)
                        *Attorneys for Plaintiff*
                        767 Third Avenue
                        New York, NY 10017-2079
                        Telephone:  (212) 201-5705
                        e-mail:  bainton@baintonlynch.com